Filed 2/11/15  In re G.R. CA 3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| In re G.R. et al., Persons Coming Under the Juvenile Court Law. | |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>E.R.,<br><br>    Defendant and Appellant. | C075969<br><br>(Super. Ct. Nos. JD233432, JD233433) |

E.R., the mother of 6-year-old G.R. and 12-year-old Jack R., appeals from an order of the Sacramento County Juvenile Court terminating dependency jurisdiction, awarding mother and father, J.R., joint legal custody of the children, awarding father sole physical custody of the children, and awarding mother supervised visitation with the children at a minimum of one Saturday per month.

1

On appeal, mother contends (1) the visitation order was an abuse of discretion because G.R.'s best interests required more frequent visitation, and (2) the juvenile court's written custody order must be amended to conform to the court's oral pronouncements on supervised visitation. We conclude the juvenile court did not abuse its discretion in ordering monthly visitation with mother. As to the written order, we conclude the written order conforms to the juvenile court's oral pronouncement regarding supervised visitation and mother did not object to the oral pronouncement. Accordingly, we affirm the orders terminating dependency and awarding custody and visitation.

FACTUAL AND PROCEDURAL BACKGROUND

*Originating Circumstances*

In January 2013, El Dorado County Sheriff's deputies responded to a residence in Cool. They arrested mother for inflicting a corporal injury on father, and they arrested father for exhibiting a firearm. The El Dorado County Department of Health and Human Services placed the children in protective custody. The children were dirty, their hair was matted, and their feet were covered with dry dirt. The residence was filled with objects mother had hoarded, thus leaving the children with no usable bedroom.

Sheriff's deputies discovered the family residence contained rat feces, had a foul odor, and had "spider webs everywhere." The deputies found 30 pills were missing from a prescription bottle of oxycodone that had been dispensed just four days earlier. The children had easy access to medications in the home and to marijuana grown by the parents. A rifle was improperly stored in close proximity to where the children slept.

Father told the social worker he and mother had been married 11 and a half years. Their relationship deteriorated when mother started taking prescribed pain medications. Mother often would take excessive medication, become "super high," and then scream and start fights. Mother was the primary aggressor and perpetrator of domestic violence. On the date of the arrests mother started screaming, awakened father and Jack, and threatened to make a false police report that father had taken mother hostage. Father told

2

mother to leave them alone.  In response, mother kicked father in the head "really hard," thus making his head bleed.  Jack witnessed the attack.  Father contacted the sheriff's department.

Mother told the social worker father was emotionally and physically abusive to her and was not financially or emotionally supportive.  She claimed the house was cluttered because the family was being evicted and they were packing for a move.  Mother denied abusing pain medications.

*Petitions*

On January 23, 2013, petitions were filed in El Dorado County Juvenile Court alleging the children came within the provisions of Welfare and Institutions Code section 300, subdivision (b), due to the parents' willful or negligent failure to provide adequate food, clothing, shelter, or medical treatment; and due to the parents' inability to provide regular care due to the parents' mental illness, developmental disability, or substance abuse.

Specifically, the petitions alleged the parents failed to provide a safe and stable home in that the home was in extreme disarray with foul odor, rat feces, and spider webs everywhere.  The children were dirty and slept on the floor in close proximity to prescription medications and an improperly stored rifle.  The parents were growing marijuana that was accessible to the children, and a recently filled prescription bottle was missing 30 pills.  The parents engaged in domestic violence including an incident in which father sustained a head injury and mother was arrested.

*Detention*

At a hearing on January 24, 2013, the children were ordered detained and placed in a foster family agency home.  The court ordered alcohol and drug testing, substance abuse treatment, and parenting education for both parents.  The parents were allowed supervised visitation twice a week, for a total of four hours per week; and two monitored five-minute telephone calls per week.

3

## *Jurisdiction and Disposition*

On January 30, 2013, father filed a petition for dissolution of the parents' marriage.

The jurisdiction report noted mother had undergone a drug test that was positive for alcohol but the result could be false due to her being a diabetic. The test also was positive for other drugs that had been prescribed for mother.

Following a contested hearing in March 2013, the juvenile court sustained the petitions and set a disposition hearing.

The disposition report confirmed mother suffered from insulin dependent diabetes and rheumatoid arthritis. Mother's physician was concerned mother was relying on pain medications to mask the rheumatoid arthritis in lieu of medications that would treat the disease.

The disposition report noted the social worker had referred mother to a service provider in the Clear Lake area to which mother had relocated. The social worker gave mother the provider's telephone number but mother did not contact the provider.

The social worker did not recommend return of the children to mother. Her erratic behaviors and inability to consider her excessive use of medication was causing emotional and physical impairment placed the children at substantial risk of emotional and physical harm.

Father was found mentally and physically able to care for the children. The social worker recommended the children be placed with father.

In April 2013, the juvenile court granted father an extended visit with the children pending the contested disposition hearing. At the contested hearing in May 2013, the court ordered that the children remain in father's care. Mother was awarded visitation two times per week for a total of three hours. Telephone contact was increased to 15 minutes per call.

*Transfer to Sacramento County*

On May 31, 2013, the El Dorado County Juvenile Court found father had established residence in Sacramento County and ordered the case transferred there.

In a July 2013 transfer-in status review report, the Sacramento social worker stated he had spoken with mother twice by telephone. Mother continued to reside with her family in Lake County and was receiving counseling services and medical care. Mother's counselor reported sessions were going well. The counselor had no concerns about mother's substance abuse and had never seen her under the influence. Mother had mood swings, depression, and anxiety, which could be associated with her mental health or her separation from father and the children.

Mother's nurse practitioner had no concerns regarding mother abusing her prescription medications.

The social worker noted G.R. continued to miss mother. G.R. said he liked his previous home better than the present one because mother was there. G.R. was sad he was not with mother, and he enjoyed and looked forward to visits with her. G.R. said, "I love mom and dad." G.R.'s counselor reported G.R. was expressing more comfort about living with his brother and father, but G.R. became "emotional at times regarding missing" mother.

Jack told the social worker he was doing very well following the move from Cool. He said visits with mother were "sort of good," although she tends to "make up stuff that isn't true" such as father owning five vicious dogs when in fact he has one very nice dog.

Father reported mother visits the children every Tuesday and Friday for two to three hours at the El Dorado Child Protective Services office. Father noted G.R. gets very upset when mother fails to attend a scheduled visit. Telephone visitations had ceased because mother wanted the conversations supervised by a person other than father and El Dorado County had not paid for that service.

5

At the August 1, 2013, transfer-in status review hearing, the Sacramento County Juvenile Court awarded mother regular visitation with the children and gave the Sacramento County Department of Health and Human Services (Department) discretion as to the length of visits and whether to begin unsupervised visits.

In a November 2013 supervised telephone conversation, mother made comments to Jack regarding father's sex life. Father directed mother to stop and she started screaming. As a result, the social worker suspended mother's telephone calls to the children.

### *Family Maintenance Review*

In a January 2014 family maintenance review report, the social worker recommended placing the children in father's custody and terminating the dependency.

The social worker wrote that G.R. "is diagnosed with Unspecified Emotional Disturbance of Childhood or Adolescence." His therapist had reported G.R. "is affected by being removed from his home, having to live in foster care temporarily, and now living without his mother as well as only getting to visit with her twice a week." Father advised that G.R. would "cry," "moan," and "scream" for mother. G.R. told his counselor mother had told him he needs to do this if he wants to be with her.

The social worker reported there had "been numerous reports of problems at the mother's visits." At a visit in July 2013, mother repeatedly told Jack to look at her rather than away from her; the visitation supervisor told mother to respect Jack's disinclination to look at her. At the same visit, mother was admonished not to speak about the parents' relationship or the juvenile court case. Mother missed a visit scheduled for the following day because too much driving was required. At a meeting the next week, mother was sensitive to Jack's teasing and told him not to treat her as he did. Mother constantly would demand Jack's attention and the demands would make him uncomfortable.

At an August 2013 visit, mother "caused a scene" when the visitation supervisor attempted to change the visit location due to space constraints. Mother cried several

6

times, argued with the visit supervisor regarding inappropriate statements mother had made to the children, and made inappropriate comments about father and the dissolution proceedings.

In September 2013, mother missed a visit because she had "car trouble and was stuck in Tiburon." Father told the social worker mother had spent the weekend in Tiburon partying. During the ensuing week, G.R. was so upset that father contacted mother and asked her to talk to G.R. Mother reportedly told G.R. she was "on a millionaire's boat and she couldn't talk." After the conversation, G.R. was "inconsolable." At the next visit, G.R. threw objects and Jack argued with mother regarding missed visits.

The social worker advised mother the missed visits were having a negative effect on G.R. She also asked mother to explain to G.R. why visits had been missed. Mother did not provide an explanation, so the social worker had to explain the reasons for missed visits.

G.R.'s therapist reported that when mother misses an expected visit he talks about being sad and upset and missing his mother. He thinks mother is sick or does not want to see him. G.R. said, "I cry when Mommy doesn't come." The therapist felt it was not healthy for the children to continue to have this level of disappointment over mother not showing up for visits. However, it was better to continue visits than to discontinue them.

Mother canceled visits on October 6 and 8, 2013, due to a dental appointment. Mother produced a letter, written by the maternal grandfather, claiming mother had to remain in Santa Rosa from October 17, 2013, through November 7, 2013, to care for the maternal great-grandmother. Mother canceled a December 2013 visit because she had not been paid. Mother said she missed visits because she "ha[d] to work" and "support [her] home," because the maternal great-grandmother had been ill, because the visit supervisor had been ill, because mother worked every day, and because mother could not afford the gasoline. Mother continued to decline visits even after she was offered visits

7

in Santa Rosa where she cared for the maternal great-grandmother. Mother objected when a visit was set up for a restaurant 15 minutes from the great-grandmother's home rather than a similar restaurant nearer to the great-grandmother's home. The visit supervisor offered to travel to Cloverdale to supervise a visit halfway between Lower Lake, where mother was living, and Santa Rosa, where the children were living, but mother insisted the visit be in Lower Lake.

A contested family maintenance review hearing was held in March 2014. Mother testified on her own behalf. She described being overly scrutinized at visits and expressed surprise that the visit supervisor considered certain matters inappropriate. Mother said G.R. cries for her and wants to come home with her. Mother said she was a good person and a great mother.

Mother testified that, after father filed for dissolution of their marriage, she had to move from the family home in Cool to Lake County where her other family members resided. Responding to questions about visits, mother said she had missed only a few visits.

Social worker Joan Klick testified she had concerns about mother's visits with the children. The primary item of concern was mother's interaction with Jack. There were frequent disagreements; mother would raise her voice, talk over Jack, become aggressive, and not let Jack complete his thought. Jack had been upset by mother's comments during visitations. However, he said they had had some good conversations.

Klick testified she was concerned about mother's ability to control her behaviors around the children. During most visits mother became upset, left the visit site, and then returned to the visit. She frequently needed to be redirected.

In summation, the Department asked that mother have a minimum of one supervised visit per month. Visits could be increased if the parents and the visit supervisor agreed.

Mother requested shared legal and physical custody of the children. Alternatively, if father received sole physical custody, mother requested unsupervised weekend visits with the children. She argued once a month visits were not in the children's best interest and cited the report from G.R.'s therapist that visits were very important to him.

The juvenile court terminated the dependency, awarded legal custody to both parents, and awarded sole physical custody to father. Mother was awarded supervised visitation a minimum of once per month. The court stated the visits shall be supervised by an agency or a person designated by the father.

DISCUSSION

# I

## *Frequency of Visitation*

Mother contends the visitation order was an abuse of discretion because G.R.'s best interests required more frequent visitation. She argues that, based on G.R.'s wishes and his therapist's recommendation, it was in his best interest to have frequent visitation with mother.

The Department counters that the exit order sets a *minimum* amount of visitation and the parents are free to agree to a greater amount. In the Department's view, mother's history of inconsistent visitation and inappropriate behavior at visits, along with the adverse impact her missed visits and behavior had upon the children, justified the juvenile court's decision to mandate no more than one visit per month.

Mother replies that, even absent an agreement between the parents, G.R.'s best interest requires greater visitation than was ordered by the juvenile court. We disagree.

## A.

## *Relevant Legal Principles*

"When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation. [Citations.] Such orders become part of any family court proceeding concerning the same child and will

remain in effect until they are terminated or modified by the family court. [Citation.]"
(*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122-1123.)

In making an exit order, the juvenile court must look to the best interests of the child under all the circumstances. (*In re John W.* (1996) 41 Cal.App.4th 961, 973.)

A visitation order is reviewed for abuse of discretion. The trial court is accorded wide discretion and its determination will not be disturbed on appeal absent a manifest showing of abuse. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

**B.**

*Analysis*

Mother argues G.R.'s desire to be with her is a "strong indication" frequent visitation is in his best interest. (Citing *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.) Mother notes that, under proper circumstances, a child's desires may be a "dominant factor" in crafting a visitation order. (Citing *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138.)

But G.R. did not desire only that visitation be ordered; he also desired that it occur. Mother had a history of failing to show up for scheduled visits, which caused G.R. to be very upset. Mother missed several visits when they were scheduled weekly. The juvenile court could infer G.R.'s desire to visit mother made him vulnerable to disappointment and harm when she did not fulfill her promise to show up at visits.

Mother relies on G.R.'s therapist's statement that G.R. was being adversely affected by living without mother and by getting to visit her only twice a week. But the therapist also reported that, when G.R. expects but fails to receive a visit, he talks about being sad and upset and missing mother. G.R. thinks mother is sick or does not want to see him. The therapist felt it was not healthy for the boys to continue to have this level of disappointment over mother not showing up for visits. The therapist did not express an opinion on the frequency of visits. Overall, the therapist thought it was better to continue visits than to discontinue them.

10

Mother contends that, for G.R. to grow into a stable, well-adjusted adult, he needs a relationship with his mother whom he actively misses. (Citing *In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) But mother's explanations for missing visits demonstrated her inability or unwillingness to make G.R.'s needs a priority in her life. Because G.R. was not mother's priority, the juvenile court could question whether an order for more frequent visitation would nurture the sort of relationship that could facilitate G.R.'s growth.

For example, mother claimed she "didn't have time" to visit G.R. because she was caring for her grandmother and "had to work every day," she had dental appointments, she could not afford the gasoline, or people were catering to father's convenience in establishing visit locations. But mother admitted her work for her grandmother was only part time and as needed, and she had no other employment that would keep her from attending visits. Mother continued to refuse visits even after she was offered visits in Santa Rosa where she cared for her grandmother. Mother objected that a visit was planned for a restaurant 15 minutes from the grandmother's home rather than a similar restaurant nearer to the residence. The visit supervisor offered to plan a visit halfway between the residences of mother and the children but mother insisted the visit be near her own home. From mother's conduct and statements she did not have time to attend visitation, the juvenile court could infer mother would continue to miss visits if they were scheduled more frequently than once per month.

Mother's statements and conduct suggested she had little concern for the adverse impact her actions were having upon G.R. After mother missed a visit in September 2013, G.R. was so upset during the week that father contacted mother and asked her to talk to G.R. Mother reportedly told G.R. she was "on a millionaire's boat and she couldn't talk." After that conversation, G.R. was "inconsolable." At the next visit, G.R. threw objects and Jack argued with mother regarding missed visits. The social worker advised mother the missed visits were having a negative effect on G.R. She asked

11

mother to explain to G.R. why visits had been missed. Mother did not provide an explanation, so the social worker had to explain to G.R. why visits were missed.

Not only did mother disappoint the children with missed visits, she also acted inappropriately at visits she attended. During many visits mother would leave the room in an emotional state and then return after regaining her composure. Mother would make inappropriate comments about father and the dissolution proceedings. The most recent visit had to be terminated early because mother asked the children to disclose the location of their confidential placement. Mother frequently needed to be redirected during visits.

Mother counters that her allegedly inappropriate behavior during visits is not a reason for limiting the frequency of visits because they are supervised. But prior supervision had not prevented mother from making comments that were upsetting to the children or necessitated termination of the visit. Supervision could not guarantee mother's behavior would be appropriate.

Mother contends she was compliant with the individual counseling component of her service plan. However, the social worker's ability to verify mother's progress was limited by mother's lack of consent for release of confidential information. Also, the record does not suggest the counseling had given mother insight into her behavior. In her testimony, she blamed father for her difficulties and believed she was being treated unfairly by the social workers.

Under the totality of present circumstances, the court's visitation order was not an abuse of its broad discretion. (*In re Robert L., supra,* 21 Cal.App.4th at p. 1067.)

## II

### *Conformation of Written Custody Order*

Mother contends the juvenile court's written custody order, which states that "[v]isits shall be supervised by an agency or a person designated by the father," should be amended to conform to the court's oral pronouncements. We reject this contention

12

because the written order conforms to the court's oral pronouncement at the end of the hearing and mother did not object to the oral pronouncement.

## A.

### *Background*

After the juvenile court announced it would "proceed to the findings and orders," the court noted the Department's request for visitation supervised by "a party both parties agree to" "just isn't going to work." Father's counsel requested visits be supervised by "someone designated by the father," specifically, "an agency or a person designated by the father, whichever he deems to be appropriate." Turning to mother's counsel, the juvenile court stated: "I would think that would be better for your client[]. It's not just pure agency but agency or somebody that the father says is okay, because at least that gives -- mom might say, 'Yeah, that would be fine with me.' " Mother's counsel agreed.

Shortly thereafter, the trial court added: "Other thing, dad, if he says, 'As far as I'm concerned, the visits can be supervised by' -- just pick a name . . . mom might say, 'I know that person and I don't want that person to supervise.' Okay. Or she might say, 'Yeah, that will be fine.' " Mother's counsel responded: "That will be agreeable as long as the mother agrees to someone that he designates; otherwise she can go to the agency."

The juvenile court then turned to the issue of the timing of visitation. After some discussion the court stated: "Back to this thing about the agency, though, right now it's the agency or person that dad suggests. Assume, worst case scenario, that he never suggests anybody or he just can't find anybody, how does this agency work? There [are] agencies -- that's what they do?" The Department's counsel answered in the affirmative.

Returning to the language recommended by the Department, the juvenile court said: "So on page 25, where it says 'supervised visits to be determined by the parents,' that would be stricken, right?" The clerk said: "Correct," and the court replaced the stricken words with "per the Court order."

13

Then, the juvenile court turned to the proposed language. The Department's counsel suggested, "supervised by an agency or by a person designated by the father." Father's counsel responded: "That's what I said, the agency or third person designated by the father." Mother's counsel raised no further objection.

The Department's counsel noted mother would pay the costs of supervision. Father's counsel noted father would provide transportation of the children to and from visits.

## B.

### *Analysis*

Mother complains that, if father elects to have visits supervised by an agency rather than an individual, mother "will have to bear the cost of a decision she had no part in." Mother has forfeited the point by failing to object to liability for supervision costs in the juvenile court. (E.g., *People v. Saunders* (1993) 5 Cal.4th 580, 589-590.)

Mother also complains the written order fails to reflect the juvenile court's intention and mother's understanding she would "have some say in who would be supervising her visits with her sons." Mother reasons that, "should the written order stand, [she] would be denied input into who would be present during visits with her sons." In mother's view, "the written order should have gone on to state, pursuant to the court's statements, that [mother] be given the opportunity to agree or object to a specific visitation supervisor."

Mother did not object to the juvenile court's proposed language for the written order. While there was a discussion among the court and the parties about how to arrange supervised visitation, the end result was the juvenile court's oral pronouncement that the visits shall be supervised by an agency or a person designated by the father. Mother did not object to this proposed language. Thus, mother has forfeited any contention the written order should include mother's understanding that if mother objects

to father's choice of an individual as visitation supervisor, then supervision would be conducted by an agency.

## DISPOSITION

The orders terminating dependency and awarding custody and visitation are affirmed.


           HOCH     , J.


We concur:


      HULL    , Acting P. J.


      MURRAY  , J.